### SHAHEEN v. UNITED STATES.
#### Civ. A. No. 2463.

United States District Court
W. D. Kentucky, at Louisville.
Dec. 4, 1953.
Supplemental Opinion April 22, 1954.

Marshall P. Eldred, Chas. B. Tachau and Brown, Eldred, Brown & Tachau, Louisville, Ky., for plaintiff.

J. Leonard Walker, U. S. Atty., Chas. F. Wood, Asst. U. S. Atty., Louisville, Ky., for defendant.

SHELBOURNE, Chief Judge.

This action was filed September 22, 1952 and tried to the Court without a jury September 10, 1953.

The action was originally filed by G. A. Shaheen and Amelia Shaheen, owners as tenants in common for their joint lives with the right of survivorship in fee of an apartment house and appurtenances known as the Oxford Apartments, located at 1427 South Second Street in Louisville, Kentucky.

After the action was filed, Amelia Shaheen died and the action was continued in the name of G. A. Shaheen as the sole owner of the property.

Plaintiff seeks to recover $9,500, which the plaintiff claims represents the extent of damage to the apartment building by reason of the defendant's failure to care for and repair the apartment property in accordance with the terms of a lease agreement entered into between plaintiff Shaheen and his wife and the United States of America, acting through the National Housing Agency.

The Court makes the following

### Finding of Facts

1. September 14, 1943, G. A. Shaheen and Amelia Shaheen (now deceased), husband and wife, owners of the apartment building and appurtenances located at 1427 South Second Street, Louisville, Kentucky, leased said apartments to the United States of America, acting through the National Housing Agency, for the term of seven years, beginning October 1, 1943 and ending September 30, 1950.

Paragraphs 4 and 9 of the written lease are portions of the lease material in this action and are as follows—

4. "The Government, during the term of this lease may build, remodel, recondition, rehabilitate, convert, change, and alter the Premises and install and maintain additions and structures thereto, including internal and external changes, and may change the number of living units in the Premises and attach fixtures thereto, and make any and all improvements thereto, including utilites and roads, at the expense of the Government: Provided, however, That these rights may be exercised in accordance with plans and specifications submitted to and approved in writing by the Lessor. The Government may make such reasonable variations from and modifications in, such plans and specifications originally approved by the Lessor as the Government deems necessary in the course of carrying out such plans and specifications. * * *

9. "The Government, during the term of this lease shall take good care of the Premises and may make any and all repairs, both interior and exterior, necessary to keep the Premises in good order, condition, and repair, without consent or approval of the Lessor. Upon the surrender of the Premises by the Government, it shall redecorate and/or repaint the vacant portion of the interior thereof."

2. At the time the lease was executed, the apartment building contained six apartments and under authority of Paragraph 4 of the lease, supra, the Government changed and converted the premises to eighteen apartments. The outbuildings consisted in the main of seventeen garages, eight of which were contiguous and facing east and nine were contiguous and facing west, all being located to the rear of the apartment building and adjacent to an alleyway.

The garage structures were of concrete blocks, with roll paper or composition roof, and over two of the garages, numbers 8 and 9, there was a two-story apartment, with shingle exterior walls, equipped with a commode and sink, designed for the occupancy by the caretaker or janitor.

3. At the time of the execution of the lease, on the northerly line of the property there was a wire fence and on the southerly end there was a board fence.

The floor of the garages was concrete and partitions between the garages were of concrete blocks or wire attached to frames.

The garage doors were each made up of three sections, which enabled the doors to be folded back against the side or partition.

At the time the lease was executed, the garages, fencing, and the apartment over two of the garages were in a reasonably good state of repair.

4. Upon the termination of the lease, there was a sag in the beams supporting the floors of the second and third floor balconies on the front of the main building. There were loose bricks on the capital or top of the column at the southern end on the front of the main building and the marble and tile work on the stairs and balustrades on each of the three floors of the main building needed repair and some portions thereof required replacement.

The reasonable cost of making the repairs to the sag of the beams supporting the balcony on the front of the building and of making the needed repairs to the plastering, marble and tile work and other repairs to the main building was $3,540.85.

5. At the termination of the lease, the garages were in a poor state of repair. The roof over all of the garages, the rafters, sheeting and guttering needed replacing and repairing and the doors on fourteen of the garages had been allowed to become broken and damaged, so they could not be repaired.

6. The Government, recognizing its obligation to repair the garages, with the exception of replacing the doors, attempted to let a contract for the repair of the garages. This contract contemplated new rafters, replacing sheeting supporting the roof and new roof, new guttering, painting the outside of the garages with two coats of exterior house paint and was able to have this material furnished and the labor performed by a reputable contractor, requiring the expenditure of $535.45.

The plaintiff prevented the Government from awarding this contract and from making the repairs contemplated and necessary under the terms of the lease with respect to the garages.

The reasonable cost of providing fourteen new garage doors is $80 per door, or a total of $1,120, the material and repairing of fencing—that is the wire fence on the northerly property line and the wooden fence on the southerly property line, is $334.36.

The cost of providing and installing a water closet and sink in the garage apartment is $50.

7. Nothing is allowed on account of the awnings.

### Conclusions of Law

I. Jurisdiction of the case and the parties is under 28 U.S.C.A. § 1346(a)(2) et seq.

II. The provisions of Clause 9 of the lease are such that during the tenure of the lease, the Government was obligated to keep the premises in good order, condition and repair and surrender the premises in such a state of repair, both interior and exterior, at the termination of the lease.

III. By its failure to keep said premises in said repair, as required by the terms of the lease, the plaintiff is entitled to recover and he is awarded judgment against the defendant in the sum of $5,580.66.

Judgment in accordance herewith will be submitted by counsel for the plaintiff, with notice to counsel for defendant.

### Corrected and Supplemental Findings of Fact and Conclusions of Law

Finding 5(a) The two-room garage apartment located above garages 8 and 9 was papered, had electric light fixtures and was equipped with a commode and

sink, and was otherwise in fair repair at the time the premises were taken over by the Government, under the terms of the lease, and this apartment was then rented. At the termination of the lease, the garage apartment was in a bad state of repair. Four windows and four doors were missing, portions of the exterior walls required replacement of shingles, and it was necessary to replace the commode and sink and paper the interior walls. The reasonable cost of these repairs, other than the commode and sink, is $200.

Conclusion of Law III. By its failure to keep said premises in said repair, as required by the terms of the lease, the plaintiff is entitled to recover and he is awarded judgment against the defendant in the sum of $5,780.66.